**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Denice Garcia, et al., | No. CV-21-01152-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Defendants Gregory Wilson and Noel Trevino, police officers with the City of Phoenix Police Department, fatally shot and killed James Garcia during an investigation on July 4, 2020. Mr. Garcia's mother, Denice Garcia, and the mother of his children, Sara Salazar, sue Officers Wilson and Trevino for alleged violations of Mr. Garcia's right to be free from excessive force under the Fourth Amendment, and of their right to be free from interference with their rights to familial society and companionship under the Fourteenth Amendment. Officers Wilson and Trevino move for summary judgment on the ground that they are entitled to qualified immunity. (Doc. 115.) The Motion is fully briefed. (Docs. 115, 118, 120, 123.) The Court held oral argument on May 28, 2024. For the foregoing reasons, the Court will grant the Motion.

## I.      BACKGROUND

The Court takes the following facts from the record and draws all justifiable inferences in Plaintiffs' favor, except for where Plaintiffs' version of events is blatantly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Most of these

events were record on the officers' body-worn cameras.

On July 4, 2020, Officers Wilson and Trevino were dispatched to investigate a reported stabbing. (Doc. 115-2 at 46.) The victim, L.A., told Officers Wilson and Trevino that an individual named "Eric" had stabbed him one week earlier.[1] (Doc. 115, Ex. 7 at 01:06-01:09, 02:32-02:41; Doc. 115, Ex. 3 at 03:20-03:47, 05:51-06:06.)[2] L.A. said that, while he was taking a shower that day at a nearby residence, Eric attempted to stab him again. (Doc. 115-2 at 46; Doc. 115, Ex. 7 at 01:14-01:30.) L.A. described Eric as "a dark-skinned Hispanic male, with blue shorts, a black and red hat, and around 5 feet 6 inches [tall]." (Doc. 115-2 at 46; *see also* Doc. 115, Ex. 7 at 01:09-01:13; Doc. 115, Ex. 3 at 03:54-05:32.) L.A. warned the officers that Eric had a knife and that other unspecified individuals at the residence possessed firearms. (Doc. 115, Ex. 7 at 01:16-01:18, 03:29-03:33; Doc. 115, Ex. 3 at 03:36-03:39.)

Officers Wilson and Trevino went to the residence to investigate. (Doc. 115, Ex. 7 at 03:34-05:35.) Several other officers met them on scene and assisted in gathering information. (*Id.* at 06:27; Doc. 115, Ex. 3 at 14:23-36:23; Doc. 115, Ex. 9 at 07:21-20:53; Doc. 115, Ex. 5 at 00:24.)[3] There, Officer Anthony Deida found Mr. Garcia sitting in a passenger car with dark tinted windows rolled up. (Doc. 115, Ex. 9 at 21:00.) The car was parked, backed into the driveway with its engine running. (*Id.*)

Officer Deida tapped on the driver's-side window of the car and Mr. Garcia rolled it down slightly. (*Id.* at 21:01-21:07.) Officer Deida asked Mr. Garcia if he was alright, and Mr. Garcia confirmed that he was. (*Id.* at 21:08-21:13.) Officer Deida then requested that Mr. Garcia turn off the car and step outside. (*Id.* at 21:14-21:17.) Mr. Garcia did not do so. (*Id.* at 21:18-21:27.) Instead, he asked why he needed to get out of the car. (*Id.*) Officer Deida explained that they were investigating a potential crime and told Mr. Garcia to keep

---

[1] The Court abbreviates the alleged victim's name to protect his privacy.
[2] Docket 115, Exhibit 7 is the footage captured by Officer Wilson's AXON body camera. Docket 115, Exhibit 3 is the footage captured by Officer Trevino's AXON body camera. All pin cites for body camera footage are to the Windows Media Player tracking bar, which tracks the temporal length of the video.
[3] Docket 115, Exhibit 9 is the footage captured by Officer Deida's AXON body camera. Docket 115, Exhibit 5 is the footage captured by Officer Backus's AXON body camera.

his hands on the steering wheel. (*Id.* at 21:20-21:27, 21:53-21:59.) Officer Deida further explained that because they were investigating a crime, they needed to identify everyone inside the residence. (*Id.* at 22:00-22:05.) He again asked Mr. Garcia to exit the car, and Mr. Garcia again refused. (*Id.* at 22:17-22:20.) Mr. Garcia asked Officer Deida what he had done wrong. (*Id.* at 22:20-22:24.) Officer Deida reiterated that they were investigating a crime and needed to make identifications. (*Id.* at 22:23-22:25.)

Still refusing to leave the car, Mr. Garcia offered to provide his identifying information to Officer Deida, although he said that he did not have any ID. (*Id.* at 22:25-22:35.) Officer Deida asked Mr. Garcia for his last name. (*Id.* at 22:40-22:42.) Mr. Garcia responded, "Garcia Salazar." (*Id.* at 22:42-22:43, 22:48-22:49.) Officer Deida then asked for his first name, and Mr. Garcia answered, "First name is Sanders . . . No, sorry, first name is . . . [inaudible]." (*Id.* at 22:46, 22:49-22:54.) Officer Deida told Mr. Garcia not to lie and asked Mr. Garcia once again for his name. (*Id.* at 22:55-23:01.) Mr. Garcia then expressed concern about a misdemeanor warrant that he had out of California for a traffic citation. (*Id.* at 23:02-23:05, 24:18-24:32.) Officer Deida assured Mr. Garcia that he did not care about a misdemeanor traffic ticket or warrant. (*Id.* at 23:05-23:11.) Mr. Garcia then stated that his name was "John Salazar Manuelo" and that he was born on "January 1, 1982." (*Id.* at 23:11-23:37.)

Officer Deida again asked Mr. Garcia to put his hands on the top of the steering wheel and to stop moving around. (*Id.* at 23:39-23:48.) Mr. Garcia complied. (*Id.* at 23:48.) Officer Deida then asked Mr. Garcia if he knew a "Derrick" (presumably meaning "Eric") who allegedly stabbed someone. (*Id.* at 24:43-25:02.) Though Mr. Garcia's answers are difficult to hear in the body camera footage, he appears to say that he does not know anything. (*Id.*) Next, Officer Deida asked about the car. (*Id.* at 25:07-25:09.) Mr. Garcia responded that the car belonged to his grandfather, Mallory Van Slyker.[4] (*Id.* at 25:09-25:14.) Officer Deida again asked Mr. Garcia to keep his hands on the steering

---

[4] Mr. Van Slyker was not Mr. Garcia's grandfather. (Doc. 115-2 at 138-40; *see also* Doc. 115-3 at 124-131.) He was a friend of Mr. Garcia's who had allowed Mr. Garcia to stay with him temporarily. (Doc. 115-2 at 138-40; *see also* Doc. 115-3 at 124-131.)

wheel. (*Id.* at 25:14-25:15.) He then asked Officer Wilson to keep an eye on Mr. Garcia while he went to his patrol vehicle to run Mr. Garcia's supposed name (John Salazar Manuelo) and date of birth. (*Id.* at 27:43-27:51.)

Now in charge of watching Mr. Garcia, Officer Wilson stepped alongside the front driver's-side window where Officer Deida had previously been standing. (Doc. 115, Ex. 7 at 38:12.) Shortly after taking his position, and while making light conversation with Mr. Garcia, Officer Wilson noticed that Mr. Garcia had lowered his right hand down toward his right hip. (*Id.* at 38:58-39:03.) Officer Wilson asked Mr. Garcia to move his hand back to the top of the steering wheel, which he did. (*Id.* at 38:58-39:03.) About a minute later, Officer Wilson asked Mr. Garcia how tall he was. (*Id.* at 39:59-40:01.) Mr. Garcia's answer cannot be heard on the body camera footage, but Officer Wilson confirmed "5'11" after Mr. Garcia answered. (*Id.* at 40:01-40:06.) At about the same time, Officer Deida, at Sergeant John Backus's direction, pulled his patrol vehicle forward into the driveway of the residence and blocked Mr. Garcia's car. (*Id.* at 40:04-40:25; Doc. 115, Ex. 5 at 00:40-00:47.)

Sergeant Backus then approached the car's front driver's-side window next to Officer Wilson and asked Mr. Garcia why he was refusing to leave the car. (Doc. 115, Ex. 5 at 01:41-01:44.) Mr. Garcia responded that he did not understand why he had to do so. (*Id.* at 01:44-01:48.) Sergeant Backus explained that they were investigating a stabbing and they needed to identify everyone at the residence. (*Id.* at 01:49-01:54.) Sergeant Backus also told Mr. Garcia that his staying in the car presented a safety hazard. (*Id.* at 01:59-02:07.) Mr. Garcia still refused to leave the car and stated that he would drive away. (*Id.* at 02:07-02:15.) Sergeant Backus told Mr. Garcia that he could not leave the scene. (*Id.* at 02:15-02:37.) In response, Mr. Garcia locked the car's doors and rolled up its windows. (*Id.* at 02:37-03:34.)

Sergeant Backus then moved to the rear of the car and left Officer Wilson by the front driver's-side window. (*Id.* at 03:10-03:43.) Officer Wilson took his eyes off Mr. Garcia momentarily while he spoke to Sergeant Backus. (Doc. 115, Ex. 7 at 42:17-42:33;

*see also* Doc. 115, Ex. 5 at 3:30-3:43.) When he turned back to Mr. Garcia, he said that he could not see Mr. Garcia's hands and then, quickly thereafter, announced that Mr. Garcia had a gun. (Doc. 115, Ex. 7 at 42:32-42:34.) Plaintiffs concede that Mr. Garcia had a gun between the driver's seat and the center console, plainly visible to Officer Wilson at that time. (*See* Doc. 31 ¶ 36.) Officer Wilson and Sergeant Backus drew their pistols. (Doc. 115, Ex. 5 at 3:46-3:48; *see also* Doc. 115, Ex. 7 at 42:34-42:37.) Officer Trevino, then standing at the end of the driveway, also drew his pistol and hurried to assist Officer Wilson and Sergeant Backus beside the car. (Doc. 115, Ex. 3 at 36:21-36:30.) After first taking a position at the front of the car, Officer Trevino moved behind Officer Wilson, beside the rear driver's-side window. (*Id.* at 36:30-36:59.)

After drawing his sidearm, Officer Wilson began issuing loud commands to Mr. Garcia: "Hey! Put that f------'—get your hand off the gun! Get your hand off the f------' gun! Get your f-----' hand off the gun!" (Doc. 115, Ex. 7 at 42:37-42:44.) While giving these commands, Officer Wilson kept the barrel of his pistol pressed against the front driver's-side window, about level height with Mr. Garcia's head. (*Id.*) Mr. Garcia leaned his head down and toward the window, tapping his temple. (*Id.* at 42:43-42:45.)

Officer Wilson continued shouting loud commands, yelling, "Let go of the God d--- gun! (*Id.* at 42:49-42:55.) Mr. Garcia again leaned his head toward the window and tapped his temple. (*Id.* at 42:53-42:56.) Officer Wilson went on: "Hey! Let go of that f-----' gun!" (*Id.* at 42:56-43:00.) He told Officer Trevino, "Hey, if he lifts that gun up anymore, I'm shooting him!" (*Id.* at 43:03-43:06; *see also* Doc. 115, Ex. 3 at 36:47-36:51.) Again, Mr. Garcia tapped his head and leaned it toward the window. (Doc. 115, Ex. 7 at 43:06-43:08.) After briefly explaining to Officer Trevino where Mr. Garcia was holding the gun, Officer Wilson turned to Mr. Garcia and clearly yelled, "Hey! Do not f----' move it, I will f-----' shoot you!" (*Id.* at 43:12-43:20.) Though inaudible, Mr. Garcia visibly mouths, "Shoot me mother f-----! Shoot me! Shoot me!" in response. (*Id.*; Doc. 115, Ex. 24 at 00:11-00:15.)

Seconds later, Officer Deida approached the front passenger's-side window of the

car. (Doc. 115, Ex. 9 at 33:14-33:33.) Using a metal pipe that he found nearby, Officer Deida swung three times at the window and broke it. (*Id.*) While not all of Mr. Garcia's movements are clear, it is apparent that he first looked toward the front passenger's-side window, flinched after Officer Deida's first swing at the window, and then rapidly flinched forward. (Doc. 115, Ex. 7 at 43:24-43:28; Doc. 115, Ex. 24 at 00:16-00:19; Doc. 115, Ex. 22 at 00:17-00:20.) His right arm is not clearly visible at that moment in any of the body camera footage. (*See, e.g.*, Doc. 115-3 at 54-117.) Nor is his gun. (*See id.*) Viewing the facts in the light most favorable to Plaintiffs, the Court assumes that Mr. Garcia did not raise his arm or gun.[5]

Immediately after Mr. Garcia's flinch forward, Officers Wilson and Trevino opened fire on him. (Doc. 115, Ex. 7 at 43:28-43:31; Doc. 115, Ex. 3 at 37:13-37:17.) Based on the body camera footage, they likely fired at least ten rounds. (Doc. 115, Ex. 7 at 43:28-43:31; Doc. 115, Ex. 3 at 37:13-37:17.) Mr. Garcia suffered two penetrating gunshot wounds in his left back and two in his right arm. (Doc. 115-3 at 146.) He received perforating gunshot wounds to his chest, right arm, and right forearm. (*Id.* at 146-47.) Finally, he suffered a graze gunshot wound to his right back. (*Id.* at 147.)

After the shots were fired, Officer Deida announced that Mr. Garcia was still moving, and several officers shouted commands for Mr. Garcia to show his hands. (Doc. 115, Ex. 7 at 43:38-43:46; Doc. 115, Ex. 3 at 37:26-37:38; Doc. 115, Ex. 5 at 04:54-05:30; Doc. 115, Ex. 9 at 33:44-34:30.) Officers Wilson and Trevino cleared the remaining shards of window glass from the front and rear driver's-side windows. (Doc. 115, Ex. 7 at 43:42-43:57; Doc. 115, Ex. 3 at 37:28-37:40.) Officers Wilson, Trevino, and Deida continued aiming their pistols at Mr. Garcia and shouting for him to take his hand off the gun. (Doc. 115, Ex. 7 at 43:57-44:26; Doc. 115, Ex. 3 at 37:40-39:06; Doc. 115, Ex. 9 at 34:30-35:23.) After about a minute and a half, Officer Deida said, "His hands are both off the gun right now. His hands are both off the gun right now. The gun is in his lap." (Doc. 115, Ex. 3 at 39:06-39:18; Doc. 115, Ex. 9 at 35:25-35:36.) About three minutes later, and

---

[5] Officers Wilson and Trevino describe Mr. Garcia as raising his right arm, gun in hand. (Doc. 115 at 2, 6-7, 18, 21.) That contention is addressed later in this Order.

after many additional warnings, Officer Bodeway reached over and grabbed a black pistol from inside the car.[6] (Doc. 115, Ex. 3 at 39:18-42:13; Doc. 115, Ex. 5 at 35:36-38:40; Doc. 115, Ex. 27 at 03:48-03:54.)[7]

Officer Trevino dragged Mr. Garcia out of the car and, with the assistance of Officer Bodeway, carried him a short distance from the residence, where he began performing CPR. (Doc. 115, Ex. 3 at 42:15-43:46; Doc. 115, Ex. 27 at 04:04-05:08.) The officers then put Mr. Garcia in a police vehicle. (Doc. 115, Ex. 3 at 43:46-44:58; Doc. 115, Ex. 27 at 05:23-06:31.) Mr. Garcia was immediately driven away from the scene to receive medical treatment from responding personnel. (Doc. 115, Ex. 3 at 44:58-45:10.) Thereafter, he was taken to a local emergency department where he was pronounced dead. (Doc. 115-3 at 147.) The medical examiner concluded that he "died as a result of multiple gunshot wounds." (*Id.* at 145, 147.)

Plaintiffs filed this lawsuit asserting claims against the City of Phoenix, Officers Wilson, Deida, and Trevino, and Sergeant Backus. (Doc. 1.) Remaining are their claims brought pursuant to 42 U.S.C. § 1983 against Officers Wilson and Trevino for their alleged violation of Mr. Garcia's right to be free from excessive force under the Fourth Amendment, and of Plaintiffs' right to be free from interference with their rights to familial society and companionship under the Fourteenth Amendment. (Doc. 31 at ¶¶ 43-60.) Officers Wilson and Trevino move for summary judgment, asserting that they are entitled to qualified immunity. (Doc. 115.)

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could

---

[6] Officer Bodeway's first name is unknown to the Court.
[7] Docket 115, Exhibit 27 is the footage captured by Officer Bodeway's AXON body camera.

return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) ("The court must not weigh the evidence or determine the truth of the matters asserted but only determine whether there is a genuine issue for trial.").

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The Court does not have a duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

### B.    Qualified Immunity

Qualified immunity is an immunity from suit. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson*, 555 U.S. at 231). Its purpose "is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (cleaned up).

A defendant in a § 1983 action is entitled to qualified immunity, once invoked, unless "(1) he violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735

(2011) (cleaned up). In moving for summary judgment, the defendant bears the burden of proof that, even construing all evidence and drawing all reasonable inferences in the plaintiff's favor, no reasonable jury could find that the defendant violated the plaintiff's statutory or constitutional rights. *See, e.g.*, *Est. of Aguirre v. County of Riverside*, 29 F.4th 624, 627-29 (9th Cir. 2022). But "[t]he plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (citation removed).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up). This "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Indeed, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742.

"Specificity is especially important in the Fourth Amendment context where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas*, 595 U.S. at 6 (cleaned up). "Thus, [the Supreme Court] has stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* But in all but the most obvious

cases, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Est. of Hernandez by & through Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1219 (9th Cir. 2024) (cleaned up).

## III.    DISCUSSION

The Court has "discretion to decide which of the two prongs of qualified immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735 (cleaned up). Here, the Court begins with the first prong.

### A.    Excessive Force (Count One)

#### 1.    Violation of a Statutory or Constitutional Right

"A police officer's application of deadly force to restrain a subject's movements 'is a seizure subject to the reasonableness requirement of the Fourth Amendment.'" *Est. of Hernandez by & through Hernandez*, 96 F.4th at 1216 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "Accordingly, any such use of deadly force must be 'objectively reasonable.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In making that determination, "the trier of fact should consider all relevant circumstances," *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022), including the following factors: (1) the nature of the force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest or lawful detention (the "*Graham* factors"); and, ultimately, (3) whether the force used was necessary. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97, and *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)).

The Court must also remember that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force

that is necessary in a particular situation." *Id.* at 396-97.

### i.    Nature of the Force

Under the first factor of the Court's reasonableness analysis, the Court must "assess both 'the risk of harm and the actual harm experienced.'" *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 821 (9th Cir. 2023) (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). "The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." *Id.* Two officers shooting approximately ten rounds at an individual from close range undoubtedly constitutes deadly force. *See Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (concluding that "shooting a firearm" is "categorically" deadly force). And "[d]eadly force is the most severe intrusion on Fourth Amendment interests because a person has a 'fundamental interest in his own life.'" *Sabbe*, 84 F.4th at 821 (quoting *Garner*, 471 U.S. at 9.) Thus, the governmental interest at stake must have been equally strong to justify the force used.

### ii.    Governmental Interest at Stake

The governmental interest at stake is defined by use of the *Graham* factors. *Espinosa*, 598 F.3d at 537. Those factors are not exhaustive, and the Ninth Circuit has considered other relevant factors "such as 'the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *Est. of Strickland v. Nevada County*, 69 F.4th 614, 619 (9th Cir. 2023) (quoting *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)). But the Ninth Circuit has made clear that the second *Graham* factor—the threat posed by the suspect—is the most important. *See, e.g.*, *id.* at 620; *Sabbe*, 84 F.4th at 822; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

### a.    Severity of the Crime

When assessing this factor, the Court is to "look to the alleged crime of the person

being detained." *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 692 (9th Cir. 2023). Mr. Garcia was not suspected of committing any crime. Indeed, Officers Wilson and Trevino do not argue that they suspected him of having committed a crime when they first approached him. (*See* Doc. 115 at 12-15.) Instead, they argue that, throughout the various officers' conversations with Mr. Garcia, they developed probable cause to believe that Mr. Garcia gave false information to a police officer in violation of A.R.S. § 13-2907.01, that he was actively attempting to obstruct the investigation, and that he had an outstanding warrant. (Doc. 115 at 14.) But Officers Wilson and Trevino do not argue that these are serious offenses that justify the use of deadly force. (*See id.* at 12-15.)

Instead, Defendants argue that the Court "should not focus too narrowly on the severity of the crime, but rather on the nature of the ongoing emergency exacerbated by" Mr. Garcia's conduct. (*Id.* at 13.) The Ninth Circuit has advised that "when police are responding to an ongoing emergency," the Court must "consider the 'serious—indeed, life-threatening—situation . . . unfolding at the time.'" *Bernal*, 73 F.4th at 692 (quoting *Ames v. King County*, 846 F.3d 340, 349 (9th Cir. 2017)) (alteration in original).

Here, Officers Wilson and Trevino were responding to an emergency. A knife-wielding individual, alleged to have stabbed L.A., was said to be sheltering inside a nearby residence. At the same time, however, none of the officers stated concern that the suspect posed an active threat at that point, as L.A. was safely within police custody. (*See* Doc. 115-2 at 45-49, 52-83, 94-111, 120-125, 128-131, 142-180.) In fact, when interviewed by the Phoenix Police Department after the shooting, Sergeant Backus appeared to suggest that, when he arrived on scene, he was not concerned that any additional violence would occur. He was asked by the interviewer, "And you knew you were investigating this felony. But there wasn't necessarily any additional violence potential to this house?" (*Id.* at 109.) He responded, "The only info that we had involving violence with this house is the allegation of a stabbing . . ." (*Id.* at 110.)

Drawing all reasonable inferences in Plaintiffs' favor, the investigation appears to have been remedial rather than preventative. While Mr. Garcia's refusal to cooperate with

law enforcement certainly frustrated a delicate situation, it was not the sort of actively life-threatening one described in *Ames* and *Bernal*. For example, the plaintiff in *Ames* actively hindered the defendants' attempts to provide potentially life-saving medical treatment to her son, who had apparently attempted suicide by overdosing on medication. 846 F.3d at 343-46, 348-49. In *Bernal*, the plaintiffs stalled the defendants' time-sensitive attempts to investigate and prevent a threatened school shooting. 73 F.4th at 683-85, 691-94. The situation that Officers Wilson and Trevino encountered did not present a similar active threat to life. Accordingly, this factor weighs against Officers Wilson and Trevino.

### b.     Threat Posed by the Suspect

"When someone points a gun at a law enforcement officer, the Constitution 'undoubtedly entitles the officer to respond with deadly force.'" *Est. of Strickland*, 69 F.4th at 617 (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). Officers Wilson and Trevino argue that Mr. Garcia did precisely that, and therefore he constituted a deadly threat. (Doc. 115 at 2, 6-7, 18, 21.) They also contend that the body camera footage demonstrates that Mr. Garcia raised his gun just prior to the shooting, and they submitted a report from an expert who reviewed and enhanced that footage and came to the same conclusion. (*Id.* at 9; Doc. 115-3 at 44-49.) But even after reviewing these materials, the Court is still "unable to discern at any point whether Mr. Garcia had control of [his] handgun." (Doc. 45 at 3.) Nor can the Court tell if Mr. Garcia ever raised the gun and pointed it at any of the officers. The Court cannot even tell from these materials whether Mr. Garcia raised his arm at the time of the shooting.

In addition to arguing that the body camera footage shows Mr. Garcia brandishing his gun, Officers Wilson and Trevino argue that the postmortem medical examination report, which noted that Mr. Garcia suffered a gunshot wound in the center of the inside of his right arm at the elbow joint, "conclusively establishes that [Mr. Garcia's] right arm was raised at the time of the shooting." (Doc. 115 at 6-7.) The report did not make such a finding, nor have Officers Wilson and Trevino put forth any testimony from a medical

1   expert to support their argument. While the Court may consider the medical examiner's

2   report, *see Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012), it declines to

3   find that the report conclusively establishes that Mr. Garcia raised his right arm at the time

4   of the shooting.

5        Plaintiffs argue that the undisputed video evidence demonstrates that Mr. Garcia

6   was not holding the gun at all.[8] (Doc. 118 at 3 ("There was no gun visible on any of the

7   police officers' body worn cameras.").) While a reasonable jury may find to the contrary,

8   the Court cannot settle that factual dispute. *Jesinger*, 24 F.3d at 1131. As the Court stated

9   at the motion to dismiss stage, "[r]easonable inferences must be drawn in Plaintiff's favor,

10   one being that the handgun was present, but that Mr. Garcia was not holding it." (Doc. 45 at

11   4); *see also Calogne v. City of San Jose*, 104 F.4th 39, —, No. 22-16495, 2024 WL

12   2873371, at *3 (9th Cir. June 7, 2024) ("Where a police officer has used deadly force, it is

13   especially important that we [construe the facts in the light most favorable to the

14   non-moving party].").

15        Nonetheless, while the act of pointing a gun at a police officer is certainly sufficient

16   to justify the use of deadly force, it is not necessary. Reasonableness does not "always

17   require[] officers to delay their fire until a suspect turns his weapon on them." *George*, 736

18   F.3d at 838 (cleaned up). Instead, an officer's use of deadly force is justified if that officer

19   "has probable cause to believe that a suspect poses a significant threat of death or serious

20   physical injury to the officer or others." *Est. of Strickland*, 69 F.4th at 620 (cleaned up).

21   Thus, even if a suspect never raises or even touches their gun, they may still constitute a

22   threat sufficient to justify the use of deadly force. *See George*, 736 F.3d at 838 ("If the

23   person is armed—or reasonably suspected of being armed—a furtive movement,

24   harrowing gesture, or serious verbal threat might create an immediate threat."); *see also*

25   *Est. of Strickland*, 69 F.4th at 620. Accordingly, the Court must determine to what degree

26   Mr. Garcia constituted a threat on the facts construed in the light most favorable to

27

28   _____

[8] In observing Plaintiffs' argument, the Court does not rely upon or credit any conclusions reached by their untimely disclosed expert, Bryan Neumeister. (*See* Doc. 113 (excluding Mr. Neumeister's report as untimely disclosed).)

Plaintiffs—that is, that he flinched while in arm's-reach of a gun but did not hold the gun, raise the gun, or raise his arm.

The Court finds that, on these facts, Mr. Garcia constituted only a minimal threat. The Ninth Circuit recently reiterated that deadly force does not become reasonable merely because an individual is armed. *See Calogne*, 104 F.4th at —, 2024 WL 2873371, at \*5 (holding that the decedent's "mere possession of a gun did not justify the use of deadly force"). Admittedly, Mr. Garcia undisputedly did more than merely possess a gun—he moved while the gun was in reach. But the Court concludes that simply flinching in reaction to a shattering window while in arm's-reach of a gun is insufficient to transform an individual into a threat warranting the use of deadly force.

Officers Wilson and Trevino disagree, relying on *Amons v. Tindall*, No. 20-16351, 2021 WL 3015107 (9th Cir. July 15, 2021). There, the defendant police officers responded to a report of a possible drug sale. *Id.* at \*1. Upon arriving on scene, the defendants found Terry Amons in a car matching a description provided in the initial report. *Id.* They approached Mr. Amons and "noticed a gun in plain view within the center console cupholder between the driver's seat and the passenger seat." *Id.* The defendants drew their pistols and began warning Mr. Amons not to reach for his gun. *Id.* Mr. Amons initially complied, but eventually slid his right hand down toward his right hip. *Id.* at \*2. The defendants began issuing loud commands for Mr. Amons not to reach for the gun. *Id.* Mr. Amons said, "But I'm not reaching for—!" but did not stop moving his hand. *Id.* One of the defendants shot Mr. Amons, who was later pronounced dead at the hospital. *Id.* The Ninth Circuit found that the defendants, whether rightly or wrongly, reasonably interpreted Mr. Amons' continued movement toward his gun as a threat to their lives. *Id.* at \*4.

*Amons* is distinguishable because, there, Mr. Amons did more than merely move while in arm's-reach of a gun. Crucially, he reached toward his gun. The video evidence in this case does not depict Mr. Garcia making a similar movement immediately before being shot. It only shows him flinch. As stated, that is not enough. Thus, this most important factor weighs against Officers Wilson and Trevino.

### c.      Whether the Suspect Was Resisting

The officers' temporary detention and attempted identification of individuals within the suspected crime scene, including Mr. Garcia, was legally permissible. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) (discussing *Terry* stops and noting that "the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further"). Mr. Garcia actively resisted that lawful detention by refusing to exit his car, rolling up his windows, and locking his doors. Thus, this factor weighs in favor of Officers Wilson and Trevino. *See Bernal*, 73 F.4th at 692-93 (finding that one of the plaintiffs resisted a lawful detention by refusing to exit her vehicle despite being ordered by police officers to do so).

### d.      Additional Factors

Neither party argues that any additional factors apply. (*See generally* Docs. 115, 118, 120.) Nonetheless, the Court finds that two are relevant to this inquiry. First, the Ninth Circuit has stressed the importance of providing warnings prior to using deadly force, when practicable. *See, e.g.*, *Gonzalez*, 747 F.3d at 794. Officers Wilson, Trevino, and Deida issued loud, frequent, and unequivocal warnings to Mr. Garcia that he must take his hand off his gun. Officer Wilson told Mr. Garcia that he would be shot if he lifted his gun. Plaintiffs do not argue that Mr. Garcia did not hear the warnings. (*See generally* Doc. 118.) But even if he did not, Officers Wilson, Trevino, and Deida did everything practicable to make sure that he did. Accordingly, this factor weighs in favor of Officers Wilson and Trevino.

Finally, the Ninth Circuit has advised that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Mr. Garcia's erratic behavior and requests that Officer Wilson shoot him suggest that he was emotionally disturbed. In such a situation, the governmental interest in using force is diminished. *Id.* This factor

weighs against Officers Wilson and Trevino.

### iii.  Necessity of the Force

At this last step, the Court must "balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (cleaned up); *see also Smith v. Yanes*, No. 2:21-CV-01732-HL, 2024 WL 759508, at *9 (D. Or. Feb. 23, 2024) (conducting this step).

Officers Wilson and Trevino used deadly force—the greatest possible force available. But taking the facts in the light most favorable to Plaintiffs, that level of force was unnecessary, and, therefore, greater than reasonable under the circumstances. This is evident from the fact that Mr. Garcia was not suspected of a serious crime, nor did he exacerbate an ongoing and life-threatening emergency; he presented a minimal threat to the safety of those nearby; and Mr. Garcia appeared to be emotionally disturbed.

On these facts, a reasonable jury could conclude that Officers Wilson and Trevino violated Mr. Garcia's right to be free from excessive force under the Fourth Amendment

### 2.  "Clearly Established"

Officers Wilson and Trevino are nonetheless entitled to qualified immunity unless it was clearly established at the time of their alleged misconduct that using deadly force in response to an uncooperative and apparently mentally disturbed individual's flinching movement while within arm's-reach of a plainly visible handgun would constitute excessive force in violation of the Fourth Amendment. *See al-Kidd*, 563 U.S. at 735; *see also Rivas-Villegas*, 595 U.S. at 6 (discussing the importance of defining the right at issue with a high degree of specificity in excessive force cases).

Plaintiffs have failed to identify any existing precedent that "squarely governs the specific facts at issue" in this case and thereby clearly established the law. *Est. of Hernandez by & through Hernandez*, 96 F.4th at 1219. In fact, their only citations to caselaw, aside from that setting the legal standard for summary judgment, came in a notice filed by Ms. Garcia just one week before oral argument. (*See* Docs. 118, 123.) That notice

included eleven case citations with no accompanying analysis.[9] (*Id.*) Ms. Garcia did not argue that any of the cases squarely govern the specific facts at issue here. (*See id.*) The Court has reviewed each of these cases and, among them, only two involved determinations that a reasonable jury could find the defendant officers' use of deadly force unreasonable. *George v. Morris*, 736 F.3d 829 (9th Cir. 2013); *Tennessee v. Garner*, 471 U.S. 1 (1985).

In *George*, the Ninth Circuit concluded that a reasonable jury could find the defendant officers acted unreasonably when they shot and killed an armed homeowner on his patio. 736 F.3d at 832-33, 839. Importantly, there was no body camera footage that captured the incident. *Id.* at 835. Without definitive proof of the events that precipitated the shooting, the court identified material questions of fact regarding whether the decedent, Donald George, presented an objective threat to the officers, and therefore, whether the defendants' use of force was reasonable. *Id.* Namely, it remained disputed whether Mr. George raised his gun at the officers or made any other threatening movements that may have rendered the defendants' response reasonable. *Id.* at 838.

At most, *George* clearly establishes that an officer may not use deadly force against an individual peaceably on their own property, making no attempt to flee, and, despite being armed, taking no other objectively threatening action—physical or verbal. *Id.* at 837-839. That is not the situation depicted here by the officers' undisputed body camera footage. Instead, it shows Mr. Garcia make a rapid movement while within arm's-reach of a gun. Thus, *George* does not clearly establish that the use of deadly force is unreasonable under these circumstances.

Nor does *Garner*. There, police officers investigating a potential residential break-in encountered Edward Garner attempting to flee by climbing a six-foot high chain link fence. *Garner*, 471 U.S. at 3. The defendant officer was "reasonably sure" that Mr. Garner was unarmed. *Id.* Nonetheless, the defendant shot Mr. Garner in the back of the head, killing him. *Id.* The Supreme Court determined that the use of deadly force was unreasonable

---

[9] In addition to these eleven cases, Ms. Garcia attempts to cite two other cases. One, "*Williams v. Las Vegas Metro*," does not contain a citation to a case reporter and the Court is unable to discern what order or opinion Ms. Garcia is referring to. Similarly, the Court is unable to locate "*A.K.H.*, 8937 F.3d at 1011."

1    because "[a] police officer may not seize an unarmed, nondangerous suspect by shooting

2    him dead." *Id.* at 11. Here, by contrast, Mr. Garcia was not "unarmed" or "nondangerous"

3    when he was shot. Instead, he was, at the very least, making a rapid movement while within

4    reach of a visible handgun. Accordingly, *Garner* does not clearly establish the law with

5    respect to the circumstances here presented.

6         Plaintiffs have therefore failed to present any case clearly establishing that Officers

7    Wilson and Trevino's use of deadly force was unreasonable under the circumstances.

8         Nor has the Court discovered any such authority in its own research.

9         *Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022), comes the closest. In *Peck*, police

10   were called after decedent Paul Mono began behaving erratically and threatened an

11   individual with a gun. *Id.* at 883. After arriving, the officers set up a perimeter and spotted

12   Mr. Mono inside his house. *Id.* Mr. Mono yelled at the officers through a window, made

13   obscene gestures, and challenged them to shoot him. *Id.* at 883-84. At some point, one of

14   the defendant officers noticed Mr. Mono's revolver lying on his couch. *Id.* at 884. Mr.

15   Mono observed this and began yelling, "I'll show you my gun! You wanna see my gun?"

16   *Id.* Another of the defendant officers commanded Mr. Mono not to go near it. *Id.*

17        At that point, the parties' stories diverged. *Id.* The defendants argued that Mr. Mono

18   reached for his gun, grabbed it, and raised it toward them. *Id.* The plaintiff claimed that

19   Mr. Mono did none of those things, and in fact, was moving away from the gun. *Id.* Further,

20   the plaintiff presented evidence that the gun was recovered "180-degrees away" from

21   where the defendants claimed, that Mr. Mono was "at least several feet away from the

22   gun," and that the gun was still in its holster when recovered. *Id.* at 887. In either case, Mr.

23   Mono was shot and killed by the defendants. *Id.* at 844. On interlocutory appeal, the Ninth

24   Circuit accepted the district court's determination that a reasonable jury could have found

25   that Mr. Mono was unarmed and moving away from the gun when he was shot. *Id.* at

26   887-88. On those facts, the Ninth Circuit held that the defendants' use of deadly force was

27   unreasonable. *Id.*

28        *Peck* is dissimilar to this case for the crucial reason that, here, there is no dispute

that Mr. Garcia made a movement while within arm's-reach of his gun. The parties agree that his gun was directly next to him. No contrary evidence suggests that, like Mr. Mono in *Peck*, Mr. Garcia was at least several feet away from it or otherwise unable to use it. Thus, *Peck* does not inform officers that, in such a situation, use of deadly force is unreasonable.

Finally, "it should go without saying that this is not an obvious case where a body of relevant case law is not needed." *Wesby*, 583 U.S. at 65 (cleaned up). "[T]o meet that high standard, Plaintiffs would have to show that '*any* reasonable official in the defendant's shoes would have understood that he was violating' the Constitution" despite the lack of caselaw. *Est. of Hernandez by & through Hernandez*, 96 F.4th at 1221 (emphasis in original) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)). They have not done so.

Officers Wilson and Trevino are therefore entitled to qualified immunity on Plaintiffs' excessive force claim.

### B.     Deprivation of Familial Society and Companionship (Count Two)

#### 1.     Violation of a Statutory or Constitutional Right

To prove that Officers Wilson and Trevino unconstitutionally interfered with Plaintiffs' rights to familial society and companionship, Plaintiffs must present evidence that Officers Wilson and Trevino's conduct "shocks the conscience' or 'offends the community's sense of fair play and decency.'" *Rochin v. California*, 342 U.S. 165, 172-73 (1952) (cleaned up). The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference" or (2) with a "purpose to harm" for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Under the first situation, if a defendant is in a position "[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "shock the conscience." *Gantt v. City of L.A.*, 717 F.3d 702, 707-08 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d

546, 554 (9th Cir. 2010)). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation," then the courts apply the "purpose-to-harm" standard. *Id.* (quoting *Wilkinson*, 610 F.3d at 554).

Under Supreme Court precedent, conduct that "shocks the conscience" includes conduct that violates the "decencies of civilized conduct," that is "brutal" or "offensive" or "arbitrary." *County of Sacramento*, 523 U.S. at 846-47 (cleaned up). "Legitimate objectives can include 'arrest, self-protection, and protection of the public,'" and "[i]llegitimate objectives include '[whether] the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).

Roughly one minute passed between the time Officer Wilson first spotted Mr. Garcia's gun and when Mr. Garcia flinched forward while within reach of the gun, precipitating Officer Wilson and Trevino's gunfire. During that time, the situation escalated as Mr. Garcia steadfastly refused to put his hands on the steering wheel. The Court therefore finds that actual deliberation was not practical under the circumstances, and that Officers Wilson and Trevino were forced to make a snap judgment because of the escalating situation. Thus, the purpose-to-harm standard applies.

Plaintiffs have presented no evidence that Officers Wilson and Trevino acted for any reason other than to protect themselves and those around them. For example, there is no evidence that their motive for using force was to bully Mr. Garcia or to get even with him in some way, or that Mr. Garcia was clearly harmless. In the absence of such evidence, a reasonable jury could not find for Plaintiffs on this claim.

## 2.    "Clearly Established"

Even if Officers Wilson and Trevino had acted with a purpose to harm, Plaintiffs have failed to cite any authority clearly establishing that the exercise of deadly force under the circumstances violated their right to be free from interference with their rights to familial society and companionship. After conducting its own research, the Court still is

not aware of any.

Accordingly, Officers Wilson and Trevino are entitled to qualified immunity on Plaintiffs' claim alleging unconstitutional interference with their right to familial society and companionship.

**IV.    CONCLUSION**

The Court finds that Officers Wilson and Trevino are entitled to qualified immunity on both of Plaintiffs' remaining claims.

**IT IS THEREFORE ORDERED** that Defendants Gregory Wilson and Noel Trevino's Motion for Summary Judgment (Doc. 115) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in Defendants Gregory Wilson and Noel Trevino's favor and close this case.

Dated this 26th day of June, 2024.

Michael T. Liburdi
United States District Judge